LATHAM & WATKINS LLP
Matthew Rawlinson (SBN 231890)
Daniel R. Gherardi (SBN 317771)
140 Scott Drive
Menlo Park, California 94025
Telephone: +1.650.328.4600
*matt.rawlinson@lw.com*
*daniel.gherardi@lw.com*

Melanie M. Blunschi (SBN 234264)
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: +1415.391.0600
*melanie.blunschi@lw.com*

*Attorneys for Defendants Ardelyx, Inc., Michael Raab, Justin Renz, and David Rosenbaum*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| In re Ardelyx, Inc. | CASE NO. 4:21-cv-05868-HSG<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: September 14, 2023<br>Time: 2:00 p.m.<br>Courtroom: 2, Fourth Floor<br>Judge: Hon. Haywood S. Gilliam, Jr. |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 14, 2023, at 2:00 p.m., or as soon thereafter as the Court's schedule allows, in Courtroom 2 of the United States District Court for the Northern District of California, located at 1301 Clay Street, 4th Floor, Oakland, California, 94612, Defendants Ardelyx, Inc. ("Ardelyx"), Michael Raab, Justin Renz, and David Rosenbaum will and hereby do move to dismiss the Second Amended Class Action Complaint (Dkt. No. 97, the "SAC" or "Second Amended Complaint") filed by Lead Plaintiff Jatin Malhotra ("Plaintiff").

This Motion is made pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 *et seq*., on the grounds that Plaintiff fails to state a claim on which relief can be granted.

Defendants' Motion is based on this Notice of Motion and Motion to Dismiss, the following Memorandum of Points and Authorities, the Request for Judicial Notice and Incorporation by Reference and Declaration of Daniel R. Gherardi filed concurrently herewith, the complete files and records in this action, and any other material and arguments as may be considered by the Court. Through this Motion, Defendants seek an order dismissing the Second Amended Complaint for failure to state a claim.

**ISSUES TO BE DECIDED**

1. Whether Plaintiff's claim under Section 10(b) of the Securities Exchange Act should be dismissed for failure to plead with particularity a material false statement or omission, scienter, or loss causation.

2. Whether Plaintiff's claim under Section 20(a) of the Securities Exchange Act should be dismissed for failure to plead a predicate violation.

Dated: June 2, 2023 Respectfully submitted,

LATHAM & WATKINS LLP

By: <u>/s/Matthew Rawlinson</u>
Matthew Rawlinson (SBN 231890)

*Attorneys for Defendants Ardelyx, Inc., Michael Raab, Justin Renz, and David Rosenbaum*

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 3
- A. The Defendants ........ 3
- B. Tenapanor ........ 4
- C. Ardelyx's Introductory Meeting With The FDA Regarding The Application ........ 4
- D. Ardelyx's Application To Expand Tenapanor's Approved Indications ........ 5
- E. Ardelyx's Disclosures Regarding Progress And Risks Of The Application ........ 5
- F. The FDA's Subsequent Findings Regarding Tenapanor ........ 6

III. LEGAL STANDARD ........ 7
IV. ARGUMENT ........ 8
- A. Plaintiff Does Not Adequately Plead Any False Or Misleading Statement ........ 8
  - 1. Nearly All Of The Challenged Statements Are Not Actionable ........ 8
  - 2. Plaintiff Has Not Adequately Alleged Any False Statement Of Fact ........ 9
  - 3. Plaintiff Has Not Adequately Alleged Any Actionable Omission ........ 11
- B. Plaintiff Does Not Adequately Plead A Strong Inference Of Scienter That Is At Least As Compelling As The Nonfraudulent Inference ........ 16
  - 1. Plaintiff Fails to Plead Scienter With Particularity ........ 16
  - 2. Plaintiff's Stock Sale Allegations Do Not Raise A Strong Inference of Scienter ........ 18
  - 3. Plaintiff's Core Operations Theory Does Not Support Scienter ........ 19
  - 4. The Non-Fraudulent Inference Is More Compelling ........ 20
- C. Plaintiff Does Not Adequately Plead Loss Causation ........ 22
- D. The SAC Should Be Dismissed With Prejudice ........ 24

V. CONCLUSION ........ 25

## Table of Authorities

### Cases

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014) ..... 9, 21

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..... 9, 19

*Colyer v. Acelrx Pharmaceuticals, Inc.,*
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ..... 11, 22

*Fort Worth Employers' Retirement Fund v. Biovail Corp.,*
615 F. Supp. 2d 218 (S.D.N.Y. 2009) ..... 23, 24

*In re AnaptysBio, Inc. Sec. Litig.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021) ..... 20

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) ..... 9, 18

*In re Atossa Genetics Inc. Sec. Litig.,*
868 F.3d 784 (9th Cir. 2017) ..... 8

*In re Axonyx Sec. Litig.*,
2009 WL 812244 (S.D.N.Y. Mar. 27, 2009) ..... 22

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ..... 8

*In re LeapFrog Ents., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ..... 19

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ..... 22

*In re Netflix, Inc., Sec. Litig.*,
923 F. Supp. 2d 1214 (N.D. Cal. 2013) ..... 11

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ..... 7

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
2018 WL 7019481 (Oct. 16, 2018) ..... 22

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ..... 24

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020) ..... 21

*In re Pixar Sec. Litig.*,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) .......... 19

*In re PTC Therapeutics, Inc. Sec. Litig.*,
2017 WL 3705801 (D.N.J. Aug. 28, 2017) .......... 14

*In re Rigel Pharms., Inc. Sec. Litig.*,
2010 WL 8816155 (N.D. Cal. Aug. 24, 2010) .......... 7, 9, 10

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) .......... 21

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) .......... 18

*In re Wayfair, Inc. Sec. Litig.*,
471 F. Supp. 3d 332 (D. Mass. 2020) .......... 19

*Jun Shi v. Ampio Pharms., Inc.*,
2020 WL 5092910 (C.D. Cal. June 19, 2020) .......... 20

*Kim v. Allakos Inc.*,
2022 WL 976974 (N.D. Cal. Mar. 31, 2022) .......... 10

*Kipling v. Flex Ltd.*,
2020 WL 2793463 (N.D. Cal. May 29, 2020) .......... 8

*Kong v. Fluidigm Corp.*,
2021 WL 3409258 (N.D. Cal. Aug. 4, 2021) .......... 10

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) .......... 9

*Kravitz v. Tavlarios*,
2020 WL 3871340 (S.D.N.Y. July 8, 2020) .......... 24

*Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) .......... 7, 11, 14, 18

*Leavitt v. Alnylam Pharms., Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020) .......... 9

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013) .......... 22

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*,
2022 WL 2525306 (9th Cir. July 7, 2022) .......... 7

*Makette v. XOMA Corp.*,
2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) .......... 9

*Marcu v. Cheetah Mobile Inc.*,
2020 WL 4016645 (S.D.N.Y. July 16, 2020) .......... 11

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... 16, 19

*Mulquin v. Nektar Therapeutics*,
510 F. Supp. 3d 854 (N.D. Cal. 2020) .......... 7, 22

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .......... 21

*Padnes v. Scios Nova Inc.*,
1996 WL 539711 (N.D. Cal. Sept. 18, 1996) .......... 10

*Pardi v. Tricida, Inc.*,
2022 WL 3018144 (N.D. Cal. July 29, 2022) .......... 11, 20

*Park v. GoPro*,
2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) .......... 9, 19

*Percoco v. Deckers Outdoor Corp.*,
2013 WL 3584370 (D. Del. July 8, 2013) .......... 20

*Ruiz v. Nat'l City Bank*,
2010 WL 1006412 (E.D. Cal. Mar. 17, 2010) .......... 24

*Schueneman v. Arena Pharmaceuticals, Inc.*,
840 F.3d 698 (9th Cir. 2016) .......... 12

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
2021 WL 4864421 (N.D. Cal. Oct. 19, 2021) .......... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 7

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) .......... 20

*Yaron v. Intersect ENT, Inc.*,
2020 WL 6750568 (N.D. Cal. June 19, 2020) .......... 23

*Zucco Partners, LLC v. Digimarc, Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 16, 24

**Statute**

15 U.S.C. § 78u-4(b)(1)(B) .......... 7

## GLOSSARY

| **Term** | **Definition** |
|---|---|
| Advisory Committee | FDA Advisory Committee of the Cardiovascular and Renal Division |
| Ardelyx or the Company | Ardelyx, Inc. |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Challenged Statements | Statements Plaintiff alleges to be false or misleading. *See, e.g.*, SAC 6, 54-55, 57, 59, 61, 64-65, 67, 69, 70, 73, 74, 77, 79, 82, 84, 86. |
| Putative Class Period | Alleged class period for persons and entities who purchased or otherwise acquired Ardelyx stock between March 6, 2020 and July 19, 2021 |
| Defendants | Ardelyx, Mike Raab, Justin Renz, and David Rosenbaum |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Ex. | Exhibits attached to the Declaration of Daniel R. Gherardi in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint filed concurrently herewith |
| FDA | United States Food and Drug Administration |
| First Amended Complaint or FAC | Amended Class Action Complaint (Dkt. No. 82) |
| IBS | Irritable Bowel Syndrome |
| NDA | New Drug Application |
| Plaintiff | Lead Plaintiff Jatin Malhotra |
| PSLRA | Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* |
| Raab | Mike Raab, Ardelyx President and Chief Executive Officer |
| Renz | Justin Renz, Ardelyx Chief Financial Officer |
| Rosenbaum | David Rosenbaum, Ardelyx Chief Development Officer |
| Rules | Federal Rules of Civil Procedure |
| Second Amended Complaint or SAC | Second Amended Class Action Complaint (Dkt. No. 97) |
| SEC | United States Securities and Exchange Commission |
| Tenapanor | Ardelyx's first-in-class pharmaceutical drug to treat patients with chronic kidney disease on dialysis |

## I. INTRODUCTION

Plaintiff's SAC is rife with hindsight second-guessing but bare of any facts supporting a fraud claim. Plaintiff seeks to capitalize on a temporary setback on the path to FDA approval for tenapanor, Ardelyx's first-of-its-kind drug candidate to treat chronic kidney disease. Though the FDA did not immediately approve Ardelyx's application to expand tenapanor's uses, Plaintiff has not pled any basis to conclude that Defendants deceived investors about the application's prospects—especially in light of the fact that Ardelyx successfully appealed the FDA's initial decision. Courts across the country recognize that "fraud by hindsight" is not sufficient to plead securities fraud, and Plaintiff offers nothing to justify a different result here.

Following numerous clinical trials, Ardelyx applied to the FDA to expand the use of a previously approved drug called tenapanor to treat an additional condition—elevated phosphorus levels in adults with chronic kidney disease on dialysis. Ardelyx consistently informed investors of the results of the clinical trials supporting the tenapanor application, as well as the heightened likelihood of an adverse FDA decision when seeking approval for a first-of-its-kind treatment mechanism. Unfortunately, the FDA did not initially approve the tenapanor application, which, unsurprisingly, caused Ardelyx's stock price to decline. Mere days later, this lawsuit followed, alleging fraud based on speculation that Defendants must have known all along their hopes for broader approval of tenapanor were doomed. But missing from each of the three renditions of the complaint since this case's inception is any particularized fact supporting that speculation.

And in the time since Plaintiff rushed to Court, an advisory committee convened by the FDA's Office of New Drugs for the purpose of providing independent expert advice to the FDA with respect to the approvability of the tenapanor application overwhelmingly voted that tenapanor *should* be approved, and the FDA subsequently *granted* Ardelyx's appeal. That is, the tenapanor application is far from doomed. Defendants noted all of these positive developments, as well as the insufficiency of Plaintiff's hindsight pleading in their prior motion to dismiss. Recognizing those deficiencies in the First Amended Complaint, Plaintiff filed the Second Amended Complaint. But nothing in the SAC cures the fatal flaws that Defendants previously identified.

**No Falsity**. Plaintiff does not adequately plead any material false statement or omission. For starters, nearly all of the statements Plaintiff challenges are not actionable as a matter of law because they are expressions of corporate optimism, forward-looking statements, or opinions. Even putting this aside, Plaintiff does not plead any facts indicating that the challenged statements—such as the expressions of management's confidence in the potential for FDA approval of the tenapanor application or the update that the trials produced a "significant phosphorus-lowering effect"—were inaccurate or otherwise misleading. Plaintiff's new assertion that the tenapanor application was in "serious peril" in March 2020—months before the application had even been filed—ignores what the FDA actually said, and ignores the steps Ardelyx took to respond to the FDA's guidance in the tenapanor application. This, of course, is consistent with the fact that a committee of independent scientific experts overwhelmingly supported tenapanor's approval and the FDA has since *granted* Ardelyx's appeal of its initial denial of the tenapanor application. Plaintiff's omission theory fares no better: Plaintiff's argument that Defendants should have disclosed the regulatory challenges associated with tenapanor's being a first-of-its-kind drug to treat elevated phosphorous in patients with chronic kidney disease on dialysis ignores the Company's disclosures about those very risks.

**No Scienter**. To plead scienter, Plaintiff must allege particularized facts that give rise to a "strong inference" that Defendants intended to defraud investors, and that inference must be "at least as compelling" as any competing non-fraudulent inferences. The SAC does not give rise to an inference of fraud at all—and certainly not to a strong inference that is at least as compelling as the inference that Defendants made optimistic statements about tenapanor (and continued to invest in the drug) because they in fact believed it would ultimately be approved for use by patients with chronic kidney disease. Tellingly, Plaintiff does not allege any facts about Defendants' states of mind at all. Instead, Plaintiff's scienter theory relies on multiple levels of speculation: first, that facts must have existed that contradicted Defendants' statements about tenapanor; and second, that because tenapanor was Ardelyx's leading drug candidate, Defendants must have known those unspecified facts and acted to defraud investors. But Plaintiff does not allege any facts (much less particularized ones) that would support these hypotheses. The only "fact" Plaintiff alleges in

support of scienter is that a single executive "sold" small amounts of stock between 2019 and 2022—but those transactions do not raise a strong inference of scienter as a matter of law because they were nondiscretionary and made pursuant to preexisting Rule 10b5-1 trading plans or to cover taxes associated with equity grants.

**No Loss Causation**. Plaintiff's sole theory of loss causation is that Ardelyx's stock price declined when it announced the FDA's initial decision on the tenapanor application. But the PSLRA requires more: Plaintiff must plead a corrective disclosure that reveals some previously undisclosed fraud—not just that one of the risks Ardelyx publicly identified eventually occurred.

The FDA's initial decision (a decision that it later overturned) was a temporary setback for Ardelyx on its path to offer a better treatment for patients with chronic kidney disease—but it did not render any of Defendants' statements false or misleading, suggest that Defendants intended to deceive anyone, or otherwise reveal fraud. Defendants expressed their confidence in the tenapanor application and disclosed the bases for that confidence. Defendants simultaneously conveyed to investors that FDA approval of the application was far from certain, and if anything, involved higher risk than candidates in a class of drugs with approved products given tenapanor's first-of-its-kind mechanism. Honest optimism followed by disappointment is not fraud. Particularly in the already challenging context of discovering and developing cutting-edge treatments for unmet medical needs, the Court should reject Plaintiff's effort to treat the securities laws as an insurance policy for investors.

Defendants respectfully seek dismissal of the Second Amended Complaint with prejudice.

## II. BACKGROUND

### A. The Defendants

Ardelyx develops novel drug therapies for people with kidney and cardiorenal diseases. SAC ¶ 25. Ardelyx consistently reminded investors that "[b]iopharmaceutical product development is a highly speculative undertaking and involves a substantial degree of risk." Ex. A (2020 Form 10-K) at 24; *see also id.* at 4, 20. Mike Raab is Ardelyx's President and CEO; Justin Renz is its CFO; and David Rosenbaum is its Chief Development Officer. *Id.* ¶¶ 21-23.

### B. Tenapanor

Ardelyx began developing tenapanor in 2009, initially to treat IBS. *Id.* ¶ 26. The FDA approved tenapanor for that use in September 2019. *Id.*; Ex. A (2020 Form 10-K) at 63. Ardelyx had also been exploring the use of tenapanor for treatment of patients with chronic kidney disease on dialysis. SAC ¶ 27. The kidney is responsible for regulating phosphorus levels in the body, and individuals with kidney disease and impaired kidney function are not able to eliminate phosphorus from the body. Ex. B (9/15/20 Press Release) at 3. Elevated phosphorus levels increase the risk of cardiovascular diseases and death, and reduction in phosphate levels into a "normal" range is recommended for patients with kidney disease. Ex. C (FDA Briefing Document) at 32.

While there are existing drugs on the market to treat elevated phosphorous levels by binding to phosphates that enter the body, approximately 70% of patients with chronic kidney disease on dialysis continue to have elevated phosphorus levels. Ex. B (9/15/20 Press Release) at 3. Tenapanor is a first-in-class medicine, meaning that it uses a new and unique mechanism: instead of binding to phosphates, it inhibits the uptake and absorption of phosphates in the body. *Id.* at 2; SAC ¶ 28. Compared to existing treatments, tenapanor would also require significantly fewer and substantially smaller pills to maintain phosphorus control. SAC ¶ 29; Ex. D (8/6/20 Press Release) at 1.

### C. Ardelyx's Introductory Meeting With The FDA Regarding The Application

In March 2020, Ardelyx and the FDA had an introductory meeting before the filing of the initial tenapanor application to expand tenapanor's approved indications. SAC ¶ 7. Introductory meetings with the FDA, like the one here, are routine, administrative meetings that typically occur after the conclusion of a company's clinical trials and in connection with an anticipated new drug application. *Id.* ¶ 8. These meetings are primarily focused on administrative matters like formatting and help to ensure that a company's forthcoming submissions are set up for success. *Id.* The introductory meeting must occur at least two months *before* a new drug application is submitted. *Id.* At the March 2020 meeting, the FDA reminded Ardelyx of the generally applicable truism that a new drug candidate must have a clinically relevant treatment effect when viewed in

the context of drugs available on the market to be considered for approval. *See id.* ¶ 7. The FDA also referenced Ardelyx's use of surrogate endpoints—i.e., a reduction in serum phosphorus—to show efficacy in tenapanor (like all other existing drugs that aim to treat elevated phosphorus in chronic kidney disease patients), and noted that because there were no industry studies showing long-term impacts on longevity from reduced phosphorus levels, a "marked" treatment effect in reducing phosphorus "could be compelling." *Id.*

**D. Ardelyx's Application To Expand Tenapanor's Approved Indications**

On June 30, 2020, Ardelyx submitted a new drug application for approval of tenapanor for the treatment of patients with chronic kidney disease on dialysis. SAC ¶ 48. After submission, the Company participated in numerous discussions with the FDA regarding the tenapanor application. *See, e.g.*, *id.* ¶¶ 50, 74, 82, 89.

In support of the tenapanor application, Ardelyx submitted results from three Phase 3 clinical trials involving over 1,000 patients. *Id.* ¶ 31. As Ardelyx publicly disclosed at the time, its clinical trials were based on "surrogate endpoints" related to the reduction in serum phosphorus as a result of tenapanor. *Id.* ¶¶ 33-37; *see* also Ex. B (9/15/20 Press Release) at 2. A "surrogate endpoint" is an indirect measurement that predicts the ultimate clinical benefit of the proposed therapy—here, a reduction in phosphorus levels was used to predict decreased risk of cardiovascular morbidity and mortality. SAC ¶ 34; Ex. B (9/15/20 Press Release) at 3. Alternatively, some clinical trials rely on "clinical outcome endpoint[s]" that measure the ultimate desired benefit of the drug, such as reduced chance of death—here, for example, whether tenapanor prolonged an individual's life. SAC ¶ 36. Nearly half of approved drugs are approved by the FDA based on surrogate endpoint data. Ex. E (FDA Surrogate Endpoint Resources for Drug and Biologic Development) at 1. The surrogate endpoints used in the tenapanor trials are the same as those used in trials that led to FDA approval of phosphate binders to treat elevated phosphorus levels. *See S*AC ¶ 36; Ex. F (FDA Table of Surrogate Endpoints) at 8.

**E. Ardelyx's Disclosures Regarding Progress And Risks Of The Application**

Ardelyx made periodic public updates about the tenapanor application, including announcing successful Phase 3 studies that met key endpoints of demonstrating tenapanor's ability

to reduce serum phosphorus levels, as well as management's continued confidence in the tenapanor application. *See, e.g.*, SAC ¶¶ 59, 74, 77, 82, 84; Ex. G (11/17/2020 Investor Presentation) (interactions to-date with FDA "have gone exceedingly well") at 4; Ex. H (2/24/21 SVB Leerink Conference Transcript) at 6 (Raab reiterating his confidence in tenapanor application). All the while, Ardelyx consistently reminded investors that the FDA approval process was inherently uncertain and, because tenapanor is the first drug to work the way it does, "there is a higher likelihood that approval may not be attained as compared to a class of drugs with approved products." *See* Ex. A (2020 Form 10-K) at 21, 41; *see also* Ex. O (5/6/21 Form 10-Q) at 32-33.

In advance of its anticipated decision date, the FDA initiated "constructive labeling discussions"—which is one of the final steps before approval of a new drug application—with the Company regarding the tenapanor application. SAC ¶¶ 50-51; Ex. I (4/29/21 Press Release) at 1-2. The FDA then requested, and Ardelyx provided, additional information related to the application, which delayed the anticipated FDA decision date to July 29, 2021. Ex. I (4/29/21 Press Release) at 1-2. Ardelyx advised the public of the additional request, and noted that it "believe[d] that that additional analyses submitted in response to recent dialogue with the agency reinforce[d] the extensive clinical evidence we generated on tenapanor" and remained "confident in the comprehensive data" included in its tenapanor application. *Id.*; SAC ¶ 82.

**F. The FDA's Subsequent Findings Regarding Tenapanor**

In July 2021, despite constructively discussing labeling—which Plaintiff admits only takes place for drugs slated for FDA approval—the FDA did not approve the tenapanor application at first. SAC ¶¶ 50, 88. This lawsuit followed just days after that preliminary decision. *See* Dkt. No. 1. The FDA's decision was not final, however. Ardelyx appealed the FDA's initial decision, and on November 16, 2022, the FDA convened a meeting of the Advisory Committee of the Cardiovascular and Renal Division to re-assess Ardelyx's tenapanor application. *See id.* ¶ 98.

As announced on November 17, 2022, that FDA committee of experts overwhelmingly voted that tenapanor's benefits outweighed its risks based on the same data submitted with the tenapanor application, and recommended that the FDA approve the application. *Id.*; Ex. L

(11/16/22 Press Release). On December 29, 2022, Ardelyx announced that the FDA *granted* the Company's appeal of the FDA's initial decision, directing its teams to work with Ardelyx on labeling for tenapanor. SAC ¶¶ 50, 99; Ex. J (12/29/22 Press Release) at 1-2. Ardelyx resubmitted its tenapanor application to the FDA on April 17, 2023, disclosing that "[l]aunch preparation activities are underway to support a second half of 2023 launch, pending approval." Ex. K (5/3/23 Press Release) at 1.

## III. LEGAL STANDARD

To state a claim for securities fraud under Section 10(b), Plaintiff must plead with particularity that a defendant made a (1) material misrepresentation or omission of fact, (2) with scienter, and (3) that caused the plaintiff's economic losses. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Plaintiff must also satisfy the "heightened pleading requirements" of Rule 9(b) and the PSLRA which "present no small hurdle." *Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 2022 WL 2525306, at *2 (9th Cir. July 7, 2022). Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and to "state with particularity all facts on which that belief [that a statement is misleading] is formed." 15 U.S.C. § 78u-4(b)(1)(B). And Plaintiff must also plead particularized facts giving rise to a strong inference of scienter, either that Defendants acted with an "intent to deceive, manipulate, or defraud" or with deliberate recklessness, which is "actually much closer to one of intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014). In addition, to plead loss causation, Plaintiff must allege with particularity sufficient facts indicating that "the revelation of [the alleged] misrepresentation or omission was a substantial factor in causing a decline in the security's price." *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 870 (N.D. Cal. 2020).[1]

---

[1] Because Plaintiff does not adequately plead a Section 10(b) claim, his Section 20(a) claim fails. *Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *13 (N.D. Cal. Jan. 27, 2020).

## IV. ARGUMENT

### A. Plaintiff Does Not Adequately Plead Any False Or Misleading Statement

Plaintiff challenges over a dozen statements related to the tenapanor application, including statements concerning management's confidence, the results of the Company's three Phase 3 clinical trials that support the tenapanor application, and Ardelyx's interactions with the FDA. According to Plaintiff, the challenged statements were misleading because they allegedly assured investors that the tenapanor application had an "extremely high chance of success and that the FDA was supportive of the [tenapanor application], when the reality was that the FDA had raised serious concerns" regarding Ardelyx's data. *See, e.g.*, SAC ¶¶ 56, 58, 60, 63, 66, 68, 71, 75, 78, 83, 85, 87. But most of the challenged statements are nonactionable puffery, forward-looking statements, or opinions. In any event, none of the "facts" Plaintiff pleads indicates that any of the statements are false or misleading, much less when made.

#### 1. Nearly All Of The Challenged Statements Are Not Actionable

As explained in Defendants' last motion to dismiss, most of the statements Plaintiff challenges are not actionable because they are vague expressions of corporate optimism, sometimes called "puffery." For example, Plaintiff challenges Defendants' description of the clinical trials as producing "comprehensive," "extensive," and "robust data" of "significant" and "clinically relevant" phosphorus-lowering effects, tenapanor as having the "potential to transform the treatment landscape for patients" and "work[ing well]," management's "confidence" in the tenapanor application, and management's confidence in the Company's interactions with the FDA as going "exceedingly well." *See, e.g.*, *id.* ¶¶ 59, 61, 67, 69, 70, 73-74, 77, 79, 82, 84, 86. These sorts of statements are not actionable because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir. 2010). Courts routinely dismiss challenges to "highly subjective claims" that are not "specific, detailed factual assertions," including optimistic descriptions of clinical data and regulatory interactions as nonactionable puffery, and the same result should follow here. *See, e.g.*, *Kipling v. Flex Ltd.*, 2020 WL 2793463, *13 (N.D. Cal. May 29, 2020); *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 799-800 (9th Cir. 2017) (rejecting statement that

management was "reasonably confident" in FDA communications as puffery); *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *9 (C.D. Cal. Sept. 20, 2017) (statements such as a drug being "well tolerated with no serious adverse events" are "statements of optimism relating to how Defendant interpreted its study results" and are "non-actionable"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (dismissing challenge to statements of confidence in "robust" product portfolio); *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *11 (N.D. Cal. Sept. 27, 2012) (statements about drug's "'excellent' or 'compelling' risk/benefit profile" and "that the trials had shown 'remarkable' safety and efficacy" were puffery).[2]

2. Plaintiff Has Not Adequately Alleged Any False Statement Of Fact

Plaintiff challenges a number of statements describing the Phase 3 clinical trials and tenapanor application as false and misleading. For example, Plaintiff challenges Defendants' description of the Phase 3 clinical trials as "successful," meeting "primary and key secondary endpoints," and demonstrating tenapanor's efficacy in reducing serum phosphorus in patients with chronic kidney disease on dialysis, as well as to management's stated confidence in the application. *See* SAC ¶¶ 59, 61-62, 67, 69-70, 79, 84. Specifically, Defendants:

- disclosed that the tenapanor application was supported by results from three Phase 3 trials "involving over 1,000 patients" and demonstrated "tenapanor's ability to reduce phosphate levels, as either a monotherapy or as part of a dual mechanism approach with phosphate binders," *id.* ¶¶ 31, 59, 67, 79;

---

[2] Many of Plaintiff's challenged statements are also nonactionable because they are forward-looking (*see, e.g.*, SAC ¶¶ 54, 57 (challenging statements that Ardelyx was "[o]n-track" and "preparing" to submit the tenapanor application)), or statements of opinion not alleged to be subjectively or objectively false (*see, e.g.*, *id.* ¶¶ 54, 57, 74, 77, 82, 86 (challenging Defendants' optimism for the tenapanor application)). The forward-looking statements are not actionable under federal securities laws because they were accompanied by cautionary language and not alleged to have been made with actual knowledge of falsity. *See Park v. GoPro*, 2019 WL 1231175, at *15 (N.D. Cal. Mar. 15, 2019). And numerous courts have rejected challenges to opinions about clinical trials and drug applications based on contrary opinions from a third party. *See In re Rigel Pharms., Inc. Sec. Litig.*, 2010 WL 8816155, at *10-11 (N.D. Cal. Aug. 24, 2010) (dismissing claims where plaintiff's allegation was merely that "there were alternative means for interpreting the clinical trial"); *see also Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020) (dismissing challenge to statements discussing clinical trial results as opinions); *Makette v. XOMA Corp.*, 2017 WL 4310759, at *4-5 (N.D. Cal. Sept. 28, 2017) (dismissing challenge to statements of defendants' opinions of clinical trial); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) ("Interpretations of clinical trial data are considered opinions.").

- noted that the Company previously reported "statistically significant topline efficacy results" and that tenapanor "produces a significant phosphorus-lowering effect," *see id.* ¶¶ 59, 67, 79, 84; and

- expressed confidence in the tenapanor application based on the results of the Phase 3 trials, as well as the fact that the FDA had already seen tenapanor's chemistry and chemical profile in connection with approving tenapanor for treatment of IBS. For example, Defendants stated that the "data [ha]s shown is that you can treat a lot of people with tenapanor alone and it will work well," *id.* ¶ 73, and Mr. Raab noted "we're quite confident with what it is that we've submitted," including because "the FDA has already seen the entire [Chemistry, Manufacturing, and Controls] package" and because "interactions [thus] far with the [FDA] have gone exceedingly well," *id.* ¶ 74.

But Plaintiff does not allege any fact indicating these statements were inaccurate even in hindsight, much less false at the time they were made. *See Kong v. Fluidigm Corp.*, 2021 WL 3409258, at *7-8 (N.D. Cal. Aug. 4, 2021) (holding plaintiff must plead with particularity that the challenged statements were "false when made," including by pointing to "defendant's statements that directly contradict what the defendant knew at that time"). Far from it, Plaintiff appears to concede that the challenged statements were true. Plaintiff does not dispute that Ardelyx *did* submit results of three Phase 3 clinical trials in support of its application, which showed a reduction in serum phosphorus levels that *met* the Company's previously (and publicly) stated endpoints, and management *was* (and remains) confident in the application for those reasons and because the FDA had previously approved tenapanor to treat another condition. *See, e.g.*, SAC ¶¶ 82-83.

Plaintiff's second-guessing the Company's accurate statements based solely on the FDA's subsequent initial decision—which was later reversed—does not render the challenged statements false. Indeed, courts routinely reject plaintiffs' hindsight-driven efforts to capitalize on negative FDA decisions where, as here, there are no facts indicating that statements prior to the decision were false. *See, e.g.*, *Kim v. Allakos Inc.*, 2022 WL 976974, at *6 (N.D. Cal. Mar. 31, 2022) (dismissing securities fraud action and holding plaintiff's "allegations would merely support questioning the efficacy of the study and would not render the company's statements false or misleading"); *Rigel Pharms.*, 2010 WL 8816155, at *11 (plaintiffs' "allegations demonstrate that there [are] alternative means for interpreting the clinical trial, not that Defendants made materially false statements about the efficacy"), *aff'd*, 697 F.3d 869 (9th Cir. 2012); *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) ("the fact that plaintiffs disagree with the

[] researchers and with defendants about the import of the [] data does not make defendants' summaries of the study false or misleading").

*Colyer v. Acelrx Pharmaceuticals, Inc.* is instructive. In dismissing plaintiffs' challenge to the company's description of its clinical trials submitted in support of its new drug application, the court noted that the "clinical history statements were not false. In fact, they were (and are) quite literally true." *Colyer*, 2015 WL 7566809, at *5-6 (N.D. Cal. Nov. 25, 2015). The court noted the statements were also not misleading, but instead they "provide an accurate snapshot of the work that AcelRx undertook prior to submission of [the] NDA." *Id.*; *see also Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *10 (N.D. Cal. July 29, 2022) (dismissing challenged statements that "accurately explained" FDA process and company's surrogate endpoint data); *see also Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *4 (S.D.N.Y. July 16, 2020) ("A violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.") (citation omitted); *In re Netflix, Inc., Sec. Litig.*, 923 F. Supp. 2d 1214, 1221-22 (N.D. Cal. 2013) (dismissing challenged statements that were "accurate descriptions" of company's business that "worked exactly as [defendant] said it would"). Similarly here, Plaintiff fails to plead falsity because each of Defendants' statements describing the Phase 3 trials and the tenapanor application was factually true and not misleading.

3. Plaintiff Has Not Adequately Alleged Any Actionable Omission

Plaintiff fares no better in alleging that any challenged statement was misleading by omission. The information that Defendants supposedly omitted—that they "knew" the FDA would not initially approve the application based on the FDA's purported statements in the March 2020 introductory meeting and because the clinical trial used surrogate endpoints—is pure fantasy, unsupported by any facts, irreconcilable with Defendants' other actions, and directly contradicted by the FDA subsequently granting Ardelyx's appeal. *See Zogenix*, 2020 WL 3820424, at *7-8 (rejecting fraud by omission allegations that defendants must have known new drug application was "deficient" and had an "exceedingly high risk of rejection" where plaintiffs pled no facts to support that assertion).

a. Defendants Properly Informed Investors Of The Risks Associated With Tenapanor's *First-Of-Its-Kind* Mechanism

As noted in Defendants' prior motion to dismiss, Plaintiff's theory ignores that the supposedly omitted information was, in fact, disclosed. Plaintiff repeats that Defendants allegedly misled investors in assuring that the tenapanor application "had an extremely high chance of success" while omitting that the "FDA had raised serious concerns" about Ardelyx's data—namely that using surrogate endpoints in the clinical trials allegedly doomed the FDA's consideration of the tenapanor application because those endpoints had not been used before. *See, e.g.*, SAC ¶¶ 58, 60, 63, 66, 71, 75, 78, 80, 83, 85, 87. But Plaintiff admits—and Defendants repeatedly emphasized in the very statements Plaintiff challenges—that tenapanor is a *first-of-its-kind* mechanism for reducing phosphorus levels and that its clinical trials used the surrogate endpoint of reducing those phosphorus levels. *See, e.g.*, SAC ¶¶ 3, 28, 79; Ex. A (2020 Form 10-K) at 3, 63 (disclosing "the first therapy for phosphate management that blocks phosphorus absorption"). Of course the FDA had not previously approved the endpoints and mechanism used with tenapanor—it had never been done before. Defendants informed investors that tenapanor and its application were "novel" and "first-in-class," which inherently made the already uncertain FDA approval process all the more uncertain. *See, e.g.*, Ex. A (2020 Form 10-K) at 2-3, 18, 21 (warning, for example, that because tenapanor was the first of its kind "there is a higher likelihood that approval may not be attained as compared to a class of drugs with approved products"); Ex. N (8/6/20 Form 10-Q) at 20-21, 37.[3]

---

[3] Plaintiff previously suggested that this case is akin to *Schueneman v. Arena Pharmaceuticals, Inc.*, *see* Dkt. No. 94 at 5-7, but that case, which the Ninth Circuit characterized as a "close call," involved materially different facts from this case 840 F.3d 698 (9th Cir. 2016). In that case, defendants stated the positive results from "all the animal studies that have been completed" supported approval of their new drug application without informing investors that the FDA had (in what the court found was an "extreme departure" from the norm) expressly raised red flags about a specific animal study (the Rat Study) that did not, in fact, show favorable results. *Id.* at 707-08. The court noted that defendants were "free to express confidence in FDA approval," but they could not claim all data was "running in [the drug candidate's] favor" when it was not. *Id.* at 708. Here, by contrast, Plaintiff cannot point to any study that contradicted any challenged statement. And the FDA did not raise red flags over Ardelyx's data—indeed, it had not even seen the data underlying the tenapanor application at the time of the March 2020 meeting where it expressed generally applicable truisms about evidence of clinical relevance being "compelling." Plaintiff cannot point to any FDA interaction with Ardelyx anywhere close to the "bi-monthly reports and follow-up studies" the FDA required of defendants in *Arena*. *Id.* at 707.

b. Plaintiff's Allegations Regarding The March 2020 Meeting Do Not Support A Finding Of Falsity

Plaintiff's sole basis for challenging virtually every statement at issue here is his unreasonable extrapolation from notes from a March 2020 meeting between Ardelyx and the FDA. Based on those notes, he speculates (without any supporting facts) that based on the meeting the "FDA's concerns were well known to Defendants." SAC ¶¶ 58, 60, 63, 66, 68, 71, 75, 80, 83, 85, 87. Plaintiff alleges that the FDA stated in March 2020 that evidence of the magnitude of tenapanor's impact on reducing serum phosphorous and how that is "clinical[ly] relevan[t]" given existing therapies would be considered in connection with the tenapanor application. SAC ¶ 41; Ex. C (FDA Briefing Document) at 8 (discussing "clinical relevance" as an assessment of the "precedent set by previously approved treatments"). According to Plaintiff, this meant the tenapanor application was in "serious peril" because it was allegedly "unclear how Ardelyx could satisfy the FDA's direction." SAC ¶ 9. But Plaintiff offers no fact in support of this assertion and his allegations fall far short of stating a securities fraud claim.

*First*, Plaintiff nowhere explains the basis for his logical leap that Ardelyx could not or did not demonstrate that tenapanor had a "marked treatment effect" on serum phosphorus. Plaintiff also does not allege any fact linking the FDA's comment that a "marked treatment effect" on serum phosphorus "could be compelling" to the purported falsity of any challenged statement or to any Defendant believing from March 2020 forward that the tenapanor application was doomed. On the contrary, Ardelyx *did* include evidence regarding the magnitude of tenapanor's efficacy in reducing serum phosphorus in patients with chronic kidney disease on dialysis. Ex. C (FDA Briefing Document) at 6, 9, 11, 42, 45 (discussing Ardelyx's submission of "substantial evidence that tenapanor is effective in reducing serum phosphorus" and patients' "pill burden"). Plaintiff includes no allegations that would indicate either that Ardelyx or the FDA did not consider this efficacy level "marked," or viewed the efficacy level as somehow inconsistent with the FDA's preliminary comments and truisms from March 2020.

Plaintiff's only "support" for his theory is the hindsight fact that the initial FDA reviewers of the tenapanor application determined in July 2021 that while tenapanor was "effective in

reducing serum phosphorus," it was unclear whether tenapanor's benefits "outweigh[ed] [its] risks." Ex. C (FDA Briefing Document) at 45, 50. But this does not track the comments the FDA purportedly gave in March 2020. To the contrary, it suggests tenapanor was effective (and Plaintiff offers nothing to suggest this is different than "marked"), but the FDA rejected the application (temporarily, as it turns out) on the basis of countervailing risks. Even putting aside this disconnect, Plaintiff cannot "merely parrot any deficiency identified by the FDA rejection letter and then claim the company concealed from the market that it failed to include this 'necessary' piece of information in its application." *Zogenix*, 2020 WL 38 20424, at *9. As the *Zogenix* court noted, "[m]ore is required to bridge the gap between conceivability and plausibility." *Id.* at *8 (citation omitted); *see also In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *11 (D.N.J. Aug. 28, 2017) (dismissing challenged statements where plaintiffs "simply assumed" defendants knew application could not meet FDA requirements without "specify[ing] the contents of those requirements"). And since then, the FDA's expert Advisory Committee and the FDA itself have *reversed* that initial position and *granted* the Company's appeal, essentially admitting that Ardelyx *did* demonstrate that the "benefits [of treatment with tenapanor] outweigh its risks for the control of [serum phosphorus] in adults with [chronic kidney disease] on dialysis." *See* Ex. C (11/16/22 Press Release) at 10; Ex. J (12/29/22 Press Release) at 1-2. In other words, the Advisory Committee reviewed Ardelyx's June 2020 application and found that it actually included the information that the FDA requested in March 2020. There is, thus, no basis to argue that the FDA's March 2020 commentary signaled that the not-yet-submitted application was doomed months before it was submitted.

*Second*, and in any event, the FDA's March 2020 notes reflect nothing more than a discussion of the FDA's well-known approach to how new drug applications are assessed. The FDA's website makes clear that drugs can be—and have been—approved based on surrogate endpoints, but surrogate endpoints are evaluated "on a case-by-case basis" and are "context dependent." *See* Ex. F (FDA Table of Surrogate Endpoints) at 1. The FDA also states that new drug applications based on previously approved surrogate endpoints may need to show *better* results than existing drugs as information and technology evolves. *Id.* (discussing that previously

used surrogate endpoints may not be sufficient or appropriate for current programs). Or they may not, depending on all the circumstances involved, disease, patient population, therapeutic mechanism, and availability of current treatments. *Id.* Nothing about the March 2020 notes cited by Plaintiff reflects anything more specific than these well-known (and well-understood) rules of the road, much less that the not-yet-filed tenapanor application was in "serious peril."

The same is true for the FDA's stated requirement that new drug applications should include evidence supporting the magnitude of the proposed drug's efficacy, including the "relevance" of that impact given the existing drug landscape. SAC ¶ 41. The FDA's website clearly states that the number one assessment for *all* new drug applications is whether the drug is "effective in its proposed use(s), and whether the benefits of the drug outweigh the risks." Ex. M (FDA Website on New Drug Applications) at 1. The Company discussed this FDA requirement in its public filings, including the need to provide evidence from clinical trials establishing the "efficacy of the drug candidate." Ex. A (2020 Form 10-K) at 8. The FDA's reiteration of that requirement for new drug applications was not a concealed fact that rendered the Company's public statements false or misleading.

*Third*, these well-known FDA positions are exactly the risks the Company warned investors about in connection with the tenapanor application. *See supra* Section IV.A.3.a. The Company warned that its success depended on the FDA's subjective, case-by-case, and context-driven interpretation of tenapanor's impact on serum phosphorus compared to both its risks and the existing drugs on the market. *See* Ex. A (2020 Form 10-K) at 11 (warning that "[e]ven if we believe a clinical trial has demonstrated . . . efficacy . . . [that] data may be interpreted by the FDA in different ways, which could delay, limit or prevent regulatory approval"); *see also id.* at 20 (warning that success depends on whether tenapanor's "efficacy profile is satisfactory to the FDA," and that while tenapanor met its clinical trial endpoints "it may not be possible or practicable to demonstrate . . . certain of the benefits we believe tenapanor possesses").

### B. Plaintiff Does Not Adequately Plead A Strong Inference Of Scienter That Is At Least As Compelling As The Nonfraudulent Inference

Even if Plaintiff had sufficiently pled an actionable false statement or omission (he has not), more is required to state a securities fraud claim: Plaintiff must plead specific facts that raise a "strong inference" that Defendants made misstatements "with an intent to deceive, manipulate, or defraud." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Those facts must indicate "an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc, Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). The inference of fraudulent intent must be "more than merely plausible," it must be "cogent" and "at least as compelling as any opposing inference of nonfraudulent intent." *Metzler*, 540 F.3d at 1066 (quoting *Tellabs*, 551 U.S. at 314).

Plaintiff's scienter allegations do not come close to meeting his heavy burden. *First*, Plaintiff does not identify *any* facts indicating Defendants' states of mind. *Second*, Plaintiff's new allegation that Raab sold stock during the Putative Class Period does not support any inference of scienter. Plaintiff points to non-discretionary trades that well-settled law holds are insufficient to support a strong inference of scienter. *Third*, Plaintiff's reliance on the "core operations" theory of scienter falls far short of the "rare instances" in which that theory is viable. And *fourth*, the inference that Defendants did not commit fraud and instead believed in the tenapanor application is far more compelling. The SAC fails to plead an intent to defraud, and Plaintiff's continued failure to identify any particularized allegations of scienter should result in a dismissal with prejudice.

#### 1. Plaintiff Fails To Plead Scienter With Particularity

Plaintiff dedicates just four paragraphs in his 47-page complaint to scienter. SAC ¶¶ 100-103. Plaintiff claims Defendants "knew (or recklessly disregarded) that the purportedly successful Phase 3 Trials were incapable of demonstrating a clinical relevant treatment effect sufficient to

deliver, or be likely to deliver, FDA approval of the tenapanor NDA." *Id.* ¶ 101. But Plaintiff does not allege a single fact to support that assertion.[4]

Plaintiff's bald assertion that Defendants' knowledge that the Phase 3 trials used surrogate endpoints equates to knowledge that the tenapanor application would not be approved by the FDA ignores the fact that FDA routinely grants new drug applications based on surrogate endpoints. Ex. E (FDA Surrogate Endpoint Resources for Drug and Biologic Development) at 1 (nearly half of drug applications approved with surrogate endpoint data). What is more, the FDA publicly "*encourages* development of novel surrogate endpoints." Ex. F (FDA Table of Surrogate Endpoints) at 2 (emphasis added). And Plaintiff's claims ignore that the very drugs (phosphate binders) tenapanor seeks to improve upon and replace to treat elevated phosphorus levels were approved using *the same* surrogate endpoints. *See* SAC ¶ 37. Ardelyx's use of surrogate endpoints was hardly a deal breaker for FDA approval—as demonstrated by the FDA's change-of-heart signaling approval for tenapanor—and Plaintiff offers nothing to suggest Defendants believed anything to the contrary. To the extent Plaintiff claims the March 2020 FDA meeting itself supports an inference of scienter, he has not alleged any fact indicating that a pre-submission meeting discussing basic FDA truisms had anything to do with the substance of the tenapanor new drug application (which had not even been submitted), much less that it amounted to a factual finding known to Defendants that the tenapanor application was doomed such that the Company's statements about the tenapanor application were knowingly misleading.

The SAC does not include any particularized allegations indicating Defendants' knowledge or intent whatsoever. Indeed, it does not cite any of the commonly alleged indicia of scienter. The SAC contains no confidential witness allegations; it contains no later admission of falsity; it contains no plausible motive allegations; and it contains no allegations of "specific reports and their contents" provided to Defendants containing facts contradicting their statements about the tenapanor application or foretelling the FDA's preliminary decision. The absence of any such

---

[4] And the SAC fails to grapple with facts that do not fit Plaintiff's narrative, including that Ardelyx was always clear with investors that tenapanor used a first-of-a-kind mechanism for treating elevated phosphorus in patients with chronic kidney disease on dialysis—which means there were ***no*** endpoints that had been used before for its drug mechanism. *See, e.g.*, Ex. N (8/6/20 Form 10-Q) at 20.

allegations is fatal to Plaintiff's claims. *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1012-13 (N.D. Cal. 2017); *Zogenix*, 2020 WL 3820424, at *9 (finding no scienter "where plaintiffs ha[d] brought forth no facts to show defendants knew the [New Drug Application] was destined for rejection"); *Arrowhead*, 2017 WL 8791111, at *6 (finding no scienter where plaintiff alleged no particularized facts that defendants had actual knowledge of information contradicting challenged statements).

Indeed, not only does the SAC not include any particularized allegations that would give rise to a compelling inference of scienter, compelling contextual evidence is completely inconsistent with an such inference of scienter. Specifically, in the months leading up to the FDA's initial decision not to approve the tenapanor application, the FDA was engaging in labeling discussions with the Company, something Plaintiff admits only happens for drugs "[]likely to receive FDA approval." SAC ¶ 50. Given this context, there is no reason (and Plaintiff certainly offers no basis) to believe that anyone at the Company would believe that the tenapanor application was not on track for approval. Likewise, after the FDA's initial decision on the tenapanor application, industry experts on the Advisory Committee overwhelmingly voted that tenapanor's clinical benefits outweighed any risks based on the same data that was in front of the FDA. *See id.* ¶ 98. Again, Plaintiff has offered no reason to believe that Defendants' belief in the tenapanor application based on the clinical trial data was not same as the rest of these experts. Nor does Plaintiff allege any basis to believe that Ardelyx would have believed that the FDA's view of the risk-benefit tradeoff was somehow different than the one it shared with the industry experts. Particularly in light of the complete absence of any allegation supporting Plaintiff's scienter arguments, the far more compelling inference is that Defendants believed in the veracity of the challenged statements and had no intent to deceive investors.

2. <u>Plaintiff's Stock Sale Allegations Do Not Raise A Strong Inference of Scienter</u>

Plaintiff's only new scienter allegation is based on a few stock trades by Defendant Raab. SAC ¶ 103. But these stock sales, as a matter of law, do not support any inference of scienter, and Plaintiff's reliance on them evinces the lack of any genuine allegations of scienter here. Every

transaction was made automatically pursuant to either a Rule 10b5-1 trading plan created before the Putative Class Period, or to "cover" taxes implicated by new equity compensation grants. *See* Ex. P (compiling Forms 4). It is well-settled that insider stock transactions pursuant to preset trading plans or in any other manner that is "non-discretionary" (such as an automatic "sell-to-cover" transaction) ***do not support*** scienter. *See, e.g., Park*, 2019 WL 1231175, at *23; *Juniper Networks*, 880 F. Supp. 2d at 1069; *see also In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 348-49 (D. Mass. 2020) (rejecting scienter allegations based on stock sales to "cover tax withholding" because they are "non-discretionary").

Even putting that aside, Plaintiff's conclusory allegations make no effort to meet the basic requirements for relying on insider transactions to support scienter. Plaintiff does not allege any fact indicating that Defendant Raab's sales were "unusual" or "suspicious." *See In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104 (N.D. Cal. 2006). Nor does he tie any sale to the possession of non-public information that Defendant Raab would have been seeking to capitalize on being unknown to investors. *In re LeapFrog Ents., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1052 (N.D. Cal. 2007) (rejecting scienter allegations because "plaintiffs make no attempt to plead how the timing of any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions"). Moreover, Plaintiff points only to sales by Defendant Raab, without any reference to what percentage of his holdings those transactions covered, or to any stock sales by any other Defendant. Courts have consistently held that sales of even significant portions of an insider's holdings do not support scienter where other named defendants did not sell stock. *See, e.g.*, *Metzler*, 540 F.3d at 1067 (rejecting stock sale scienter allegations without "corroborat[ing]" sales by other defendants).

3. Plaintiff's Core Operations Theory Does Not Support Scienter

Unable to plead that any Defendant intended to defraud investors, Plaintiff seeks refuge in the common last-ditch effort of securities plaintiffs: a core operations theory of scienter, *i.e.*, that because tenapanor was "important" to Ardelyx the Court should assume that Defendants knew every possible adverse fact about it. SAC ¶ 102. But a core operations theory alone is insufficient

to satisfy the PSLRA. *See, e.g.*, *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *19 (N.D. Cal. Dec. 18, 2017) ("the core operations theory, standing alone, does not satisfy the PSLRA").

In any event, Plaintiff's allegation fails to meet the high threshold for relying on a core operations theory at all to raise a compelling inference of scienter. *See Percoco v. Deckers Outdoor Corp.*, 2013 WL 3584370, at *5 (D. Del. July 8, 2013) ("Only in rare instances can core operations alone allow inferences of scienter."); *Welgus*, 2017 WL 6466264, at *19 (holding that the core operations theory is "not easy"). Invoking core operations requires a plaintiff to "produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of the company's operations, such as data monitoring," or specific "witness accounts demonstrating that executives had actual involvement in creating false reports." *Welgus*, 2017 WL 6466264, at *19 (citation omitted). The SAC includes only the lackluster allegation that the approval of one of the Company's product candidates was important to Ardelyx's commercial prospects. SAC ¶ 102. This is a common strategy by plaintiffs trying to turn a routine drug application denial into a fraud case. But courts (including this Court) have held that "merely emphasizing the importance of [a drug] to the Company does not show that the core operations theory applies." *See, e.g.*, *Pardi*, 2022 WL 3018144, at *15 (citing cases and finding plaintiffs' argument that the "the day-to-day operations at [the company] . . . focused solely on shepherding [the drug] through clinical trials and FDA approval to commercialization" insufficient to establish scienter through the core operations theory); *In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413, at *14 (S.D. Cal. Sept. 20, 2021) (rejecting plaintiffs' core operations theory based on the importance of the company's drug). Plaintiff has done nothing more here.

4. <u>The Non-Fraudulent Inference Is More Compelling</u>

Even viewing Plaintiff's allegations holistically, his scienter theory rests on the absurd proposition that Ardelyx would expend enormous resources conducting its Phase 3 clinical trials despite purportedly knowing that the FDA was likely to reject the tenapanor application, just to keep the Company's stock price inflated in the short-term. *See* SAC ¶¶ 52, 58, 60, 63, 66, 71, 75, 78, 80, 83, 85, 87. That is not plausible. *See, e.g.*, *Jun Shi v. Ampio Pharms., Inc.*, 2020 WL 5092910, at *5 (C.D. Cal. June 19, 2020) ("[t]he idea that this company, highly dependent on the

success of the new drug, would knowingly or recklessly carry on a defective trial—so that any defects were not remedied—virtually defies reason[.]") (alterations in original) (citation omitted); *Pfizer*, Inc., 754 F.3d at 170 ("improbable" that defendants "would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure"); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) ("implausible" that defendant continued to fund trials while "believing that FDA approval was unlikely, impossible, or, if achievable, only on a delinquent time schedule").

Most fundamentally, Plaintiff does not allege any fact supporting an inference that Defendants intended to defraud investors. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (noting it "makes no sense" for defendants to "promise the market that the FDA would approve [the new drug] if defendants knew the FDA would eventually figure out that [the new drug] could not be approved due to 'intractable' and 'unresolvable' [] problems"). As the Ninth Circuit observed in *Nguyen*: "[W]hy would defendants promise the market that the FDA would approve [the new drug] if defendants knew the FDA would eventually figure out that [the new drug] could not be approved due to 'intractable' and 'unresolvable' [] problems?" *Id*. If Defendants "would rather keep the stock price high for a time and then face the inevitable fallout once [the drug's] 'unsolvable' [] problem was revealed," they presumably would have "sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium." *Id.* There are no factual allegations like that here. The far more compelling explanation for Defendants' statements and continued commitment to tenapanor and Ardelyx is that they believed (and continue to believe) the clinical trials were appropriate indicators of tenapanor's efficacy and tenapanor would be approved. That the FDA did not approve the initial application does not render Defendants' optimism fraudulent. *See e.g.*, *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *17 (N.D. Cal. July 21, 2020) ("honest optimism followed by disappointment is not the same as lying or misleading").

Plaintiff's theory is even more implausible given the clinical trials were designed with the input of the FDA and used surrogate endpoints that matched those used by other drugs approved by the FDA to treat elevated phosphorus levels in patients with chronic kidney disease on dialysis.

*See, e.g.*, SAC ¶ 37. Indeed, Defendants repeatedly warned investors that tenapanor was a *first-of-its-kind* drug, which made approval by the FDA even more uncertain than it inherently is for any new drug application. *See, e.g.*, Ex. N (8/6/20 Form 10-Q) at 37; Ex. A (2020 Form 10-K) at 18, 21. That is not evidence of an intent to defraud, it is evidence of transparency and good-faith optimism. *See also Colyer*, 2015 WL 7566809, at *14 (inference that the defendants sought FDA approval in good faith was more compelling than scienter); *In re Axonyx Sec. Litig.*, 2009 WL 812244, at *4-5 (S.D.N.Y. Mar. 27, 2009) (dismissing plaintiffs' complaint and concluding that more plausible inference is "that [the company] did its best to design and carry out a successful clinical trial").

### C. Plaintiff Does Not Adequately Plead Loss Causation

Plaintiff's SAC should also be dismissed because it fails to plead loss causation, which requires Plaintiff to allege sufficient facts indicating that "the revelation of [the alleged] misrepresentation or omission was a substantial factor in causing a decline in the security's price." *Mulquin*, 510 F. Supp. 3d at 870. Typically, this requires allegations of "corrective disclosures" of some previously undisclosed "truth" that causes a stock price decline. *Id*. Plaintiff must state "with particularity the circumstances" demonstrating "a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022); *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018 WL 7019481, at *3 (Oct. 16, 2018) (particularity requirements apply to all elements of securities fraud action, including loss causation). Here, the FDA's initial decision on the tenapanor application was a different take on the evidence of tenapanor's efficacy, but it did not show that any prior statement was false or reveal any previously undisclosed fraud.

Plaintiff alleges just one purported corrective disclosure within the Putative Class Period—the July 19, 2021, press release announcing the FDA's initial decision not to approve the tenapanor application—which did not "correct" any challenged statement.[5] *See* SAC ¶¶ 88-90; Ex. Q

[5] Plaintiff also cites to certain post-Putative Class Period statements about Ardelyx's communications with the FDA, none of which Plaintiff alleges to be false or misleading, nor to be the cause of a decline in Ardelyx's stock price. SAC ¶¶ 91-99. Disclosures "after the close of the proposed class period . . . cannot be a corrective disclosure sufficient to establish loss causation." *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *10 (S.D.N.Y.

(7/19/21 Press Release) at 1-2. The July 19, 2021, press release did not reveal any previously concealed information or any information contradicting or even undermining any of the challenged statements. It did not include an admission by Defendants that the Phase 3 clinical trials were not successful; it did not repudiate the efficacy of tenapanor; it did not mean that management was lying when it said it was confident in the application at the time it made those statements. Although the FDA's letter was "extremely disheartening and disappointing," Ex. Q (7/19/21 Press Release) at 1, its announcement was simply the materialization of a risk Ardelyx specifically and repeatedly warned investors could occur. *See supra* Section IV.A.3.a (discussing risk disclosures).

Plaintiff's effort to plead loss causation based on the materialization of a risk fails out of the gates because the Ninth Circuit has not adopted such a theory for loss causation. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2021 WL 4864421, at *6 n.3 (N.D. Cal. Oct. 19, 2021) ("Although other circuits have recognized materialization of the risk as a method to plead loss causation the Ninth circuit has not."). But even in Circuits that do recognize this theory, it requires a plaintiff to plead that the defendant concealed the risk; materialization of a known and disclosed risk is not enough to plead loss causation, particularly without anything in the purported corrective disclosure even hinting at fraud or impropriety. *See Yaron v. Intersect ENT, Inc.*, 2020 WL 6750568, at *10 (N.D. Cal. June 19, 2020) (dismissing on loss causation grounds where corrective disclosure concerned only materialization of known risk).

The decision in *Fort Worth Employers' Retirement Fund v. Biovail Corp.* about a stock drop after an adverse FDA decision is instructive here: "[t]he all-but-inevitable decline in the [company's stock] price . . . following the company's announcement that the FDA had not approved the [new drug application] . . . was caused by the agency's failure to approve the drug—not by any 'corrective' disclosure of some prior untruth." 615 F. Supp. 2d 218, 229 (S.D.N.Y. 2009). Indeed, as in *Fort Worth*, Plaintiff "acknowledges, after the FDA's initial rejection, . . . [the company] maintained its public stance" that the basis for the application was proper. *Id.* The

---

Aug. 5, 2013). And, in any event, such statements undermine Plaintiff's entire theory of fraud given that the FDA and its Advisory Committee now agree that tenapanor is "one step closer to having a much-needed novel therapy" for patients with chronic kidney disease. Ex. J (12/29/22 Press Release) at 2.

same is true here: Defendants' description of the Phase 3 clinical trials and their confidence in the tenapanor application stayed consistent even after the FDA's initial decision and through the FDA granting its appeal. *See, e.g.*, SAC ¶¶ 91-99; Ex. R (7/29/21 Press Release) at 3; Ex. S (11/18/21 Jefferies Conference Transcript) at 2; Ex. J (12/29/22 Press Release) at 2-3.

That the markets were disappointed about the FDA's initial decision does not demonstrate fraud, and it does not support loss causation. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010) (loss causation not supported when the market reacts to materialization of known risks). That "all-but-inevitable decline" following disappointing news is not sufficient to plead loss causation in a securities fraud action, and the SAC should be dismissed on this additional basis as well. *Fort Worth*, 615 F. Supp. 2d at 229.

**D. The SAC Should Be Dismissed With Prejudice**

This is the third complaint Plaintiff's counsel has filed in this action, and the Court should dismiss it with prejudice. *See Zucco*, 552 F.3d at 1007 (holding that a court may deny leave to amend due to, among other things, "repeated failure to cure deficiencies by amendments previously allowed"). Here, the record shows that further amendment would be futile. After a year of being the presumptive lead plaintiff in this action, Plaintiff filed his First Amended Complaint. Defendants moved to dismiss the FAC, detailing all of the deficiencies in Plaintiff's claims that required dismissal. Plaintiff, apparently acknowledging that the FAC fell short of stating a claim, elected to file the SAC but made no effort to cure the fundamental flaws in his claims. That failure on the third try to cure the deficiencies Defendants described demonstrates that Plaintiff cannot state a claim. Dismissal with prejudice is appropriate in these circumstances, even where no opinion was issued on the merits of the earlier motion. *See, e.g.*, *Ruiz v. Nat'l City Bank*, 2010 WL 1006412, at *5 (E.D. Cal. Mar. 17, 2010) (dismissing with prejudice on futility grounds even though the court had not issued an earlier opinion on the merits); *cf. Kravitz v. Tavlarios*, 2020 WL 3871340, at *12 (S.D.N.Y. July 8, 2020) (denying leave to amend noting that pleading is not "an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable claim emerges"). Plaintiff has had ample

opportunity to attempt to satisfy his pleading burdens, and the Court should not force Defendants to continue to defend against Plaintiff's meritless claims.

## V. CONCLUSION

Defendants respectfully request that the Court grant Defendants' Motion to Dismiss with prejudice.

Dated: June 2, 2023

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ *Matthew Rawlinson*

Matthew Rawlinson (SBN 231890)
Daniel R. Gherardi (SBN 317771)
140 Scott Drive
Menlo Park, California 94025
Telephone: (650) 328-4600
*matt.rawlinson@lw.com*
*daniel.gherardi@lw.com*

Melanie Blunschi (SBN 234264)
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 391-0600
*melanie.blunschi@lw.com*

*Attorneys for Defendants*